1  R. Christopher Harshman, Esq. (248214)
   charshman@lovitziplaw.com
2  LOVITZ IP LAW PC
3  9701 Wilshire Boulevard, Suite 1000
   Beverly Hills, California 90212
4  Telephone:   (310) 425-3529
   Facsimile:   (310) 773-9208
5
6  K. Christopher Branch (State Bar No.134876)
   KC Branch Firm
7  1177 Marsh Street, Suite 100
   San Luis Obispo, CA 93401
8  Telephone:  (805) 539-1700
   Email: kc@winelaw.net
9
   Attorneys for Defendants Cold Heaven Cellars, LLC
10 and Morgan Clendenen

11              UNITED STATES DISTRICT COURT
12              CENTRAL DISTRICT OF CALIFORNIA

13 | Bonvivino Capital, LLC, | Case no. CV 12-08185-ODW (FFM)
14 |                   Plaintiff, | Assigned to the Hon. Otis D. Wright, II
15 | vs. | **COLD HEAVEN'S OCTOBER 23, 2013 BRIEF REGARDING THE IMPROPRIETY OF PROFIT SHARING**
16 | Morgan Clendenen *et al*, |
17 |                   Defendants. |

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  FACTS ............................................................................................................. 2

    A.   THE RED WINE PROGRAM ........................................................................ 2

    B.   MANLIN AND HIS INVOLVEMENT IN THE RED WINE PROGRAM .............. 2

    C.   COLD HEAVEN ......................................................................................... 4

    D.   MORGAN CLENDENEN ............................................................................. 4

    E.   MANLIN'S KNOWLEDGE OF ILLEGALITY ................................................. 4

    F.   CLENDENEN COULD NOT HAVE ADDED MANLIN TO THE LICENSE OR PERMIT ... 5

III. ARGUMENT ................................................................................................... 5

    A.   MANLIN'S INVOLVEMENT WAS NOT PASSIVE ......................................... 5

    B.   FEDERAL TTB PERMIT REQUIRED .......................................................... 6

    C.   CALIFORNIA ABC LICENSE REQUIRED .................................................. 8

    D.   THE ALLEGED CONTRACT IS ILLEGAL .................................................. 10

    E.   CLENDENEN'S ACTS DO NOT FALL WITHIN THE *IN PARI DELICTO* EXCEPTION ... 12

    F.   CAL. BUS. & PROF. CODE § 23101 DOES NOT APPLY ......................... 13

IV.  REFORMATION OF THE CONTRACT .................................................. 15

V.   CONCLUSION .............................................................................................. 15

# TABLE OF AUTHORITIES

### CASES

*Berner v. Lazzaro*, 730 F.2d 1319 (9th Cir. 1984) -------- 13

*Brenner v. Haley,* 185 Cal. App. 2d 183 (1960) -------- 11

*Cockerell v. Title Insurance & Trust*, 2 Cal.2d 284 (1954) -------- 14

*In re CFLC, Inc.,* 166 F.3d 1012 (9th Cir. 1999) -------- 14

*McIntosh v. Mills*, 121 Cal.App.4th 333 (2004) -------- 11, 12, 13

*River Lines, Inc. v. Public Util. Com*. 62 Cal.2d 244 (1965) -------- 14

*Wong v. Tenneco, Inc.*, 39 Cal. 3d 126 (1985) -------- 11

*Yoo v. Jho*, 147 Cal. App. 4th 1249 (2007) -------- 11

### STATUTES

27 U.S.C. § 201 -------- 6

27 U.S.C. § 203 -------- 6

Cal. Bus. & Prof. § 23001 -------- 8, 11

Cal. Bus. & Prof. § 24040 -------- 10

Cal. Bus. & Prof. Code § 23008 -------- 10

Cal. Bus. & Prof. Code § 23101 -------- 13, 14

Cal. Civil Code § 1667 -------- 10

Cal. Code Civ. Proc. § 680.200 -------- 14

### OTHER AUTHORITIES

47 Ops. Cal. Att'y. Gen 182 (1966); 1966 Cal. AG LEXIS 86 -------- 9

Black's Law Dictionary (9th ed. 2009) -------- 14

California Department of Alcoholic Beverage Control June 2009 Industry Advisory -------- 9

### REGULATIONS

27 C.F.R. § 24.101 -------- 6

27 C.F.R. § 24.105 ----------------------------------------------------------------------------------------------------------- 6

27 C.F.R. § 24.106 ----------------------------------------------------------------------------------------------------------- 6

27 C.F.R. § 24.109 ----------------------------------------------------------------------------------------------------------- 7

27 C.F.R. § 24.110 --------------------------------------------------------------------------------------------------------7, 14

27 C.F.R. § 24.120 ----------------------------------------------------------------------------------------------------------- 7

27 C.F.R. § 24.146 ----------------------------------------------------------------------------------------------------------- 7

27 CFR § 24.123 ------------------------------------------------------------------------------------------------------------ 7

<u>CONSTITUTIONAL PROVISIONS</u>

California Constitution, Art. XX, Sec. 22 ---------------------------------------------------------------------------8, 10

This brief responds to the Court's October 2, 2013 Order (ECF No. 108) regarding the second affirmative defense raised by defendants Morgan Clendenen ("Clendenen") and Cold Heaven Cellars, LLC ("Cold Heaven" and together, "Defendants"): that the claim of plaintiff Bonvivino Capital, LLC ("Bonvivino" or "Plaintiff") "for a share of the profits [of the red wine program at issue in this litigation] are a violation of California B&PC 23330-23301, as Plaintiff lacks the necessary permits from the CA Alcoholic Beverages Commission and would be committing a crime[1] if it shared in the profits of any sales." (Defendants' Answer, Affirmative Defense no. 2.)

## I.   INTRODUCTION

For more than a decade and a half, Morgan Clendenen has been making highly regarded Viognier white wine, and equally respected Pinot Noir and Syrah red wines, through her boutique winery, Cold Heaven. She has done so through hard work, persistence, experience, skill, and by force of will.

In 2009, while involved in a romantic relationship with Clendenen, Scott Manlin ("Manlin"), the managing member of his Bonvivino, proposed that he and Clendenen collaborate on 2009 vintage red wines; this collaboration was later expanded to include red wines made in 2010 as well (together, the "Red Wine Program"). Cold Heaven, through its agents, provided Manlin with notice that either his Bonvivino would need to be licensed to participate in profits from the sale of wine, or the Red Wine Program (which Manlin has alleged was a joint venture) would need to be formalized as a separate, licensed entity.

In spite of this, Manlin never took the steps necessary steps to become licensed, or to set up a separate licensed entity. As a result, neither he nor his Bonvivino can legally participate in profits made from the sale of the Red Wine Program wines. As such, the oral agreement alleged by Bonvivino, even if the terms were as Plaintiff asserts, cannot be enforced as alleged – it is illegal and void, and must at the very least be reformed, e.g., under a doctrine of rescission, where Bonvivino is made whole for the legitimate

---

[1] The Court's Order spoke of the "impropriety of profit sharing," but sharing would actually be *illegal*.

amounts actually contributed (under mutually agreed upon, certain terms) to the alleged Red Wine Program, perhaps with a security interest granted as to one half of the remaining Red Wine Program inventory, that Bonvivino can then (assuming necessary permission is granted) sell to an authorized licensee in accordance with California law.

## II. FACTS

### A. The Red Wine Program

Bonvivino has, in its September 21, 2012 Complaint ("Compl.") in this action, has alleged the existence of an oral agreement for a purported "joint venture" regarding (as alleged by the Plaintiff) "the production, development, ownership, marketing, sale and distribution of … red wine." (Compl., ¶ 13.) Bonvivino further alleges that the terms of this oral joint venture agreement included that "profits from the sale of the Wine … shall be distributed 50% to [Cold Heaven] and 50% to Plaintiff." (Id., ¶ 14(5).)

No security interest was created in the wine produced by the Red Wine Program (Declaration of Morgan Clendenen ("Clendenen Decl.") filed concurrently herewith, ¶ 7), and no interest in Cold Heaven was transferred to Bonvivino or Manlin, through the Red Wine Program or otherwise. (Id., ¶ 13.)

### B. Manlin and His Involvement in the Red Wine Program

Manlin is "a commercial real estate finance executive with an MBA in Real Estate Finance." (March 24, 2013 Declaration of Scott S. Manlin, ECF No. 33-9 ("Manlin Decl."), ¶ 3.) He states he is the "sole manager of Plaintiff Bonvivino Capital, LLC" and that he has been "the manager of Bonvivino from its formation until the present date." (Id., ¶¶ 1-2.) He describes Bonvivino as being "in the business of entrepreneurial investment and commercial real estate consulting [and] its business activities consist of its investment in the partnership with Cold Heaven Cellars…" (Id., ¶ 3.)

Manlin's Bonvivino has alleged that "Plaintiff or its managing member [Manlin] [would incur costs] in connection with sale or marketing of the Wine." (Id.) The Plaintiff has also alleged several other purportedly actionable acts allegedly taken by the Defendants, including "preventing Plaintiff and its agents and representatives from

entering joint venture or CH LLC property, including the Winery; interfering with Plaintiff's access to any assets or inventory; [and] without cause and without notice stripping Plaintiff [sic] of all rights and privileges as the chief financial officer" of Cold Heaven. (Id., ¶ 17.) Manlin had, from on or about June 23, 2011 through at least January 3, 2012, unfettered access to – and was a signatory on – Cold Heaven's bank account. (Clendenen Decl., ¶ 11.)

Manlin himself claims: "With respect to the vineyard sources for the [Red Wine Program], I was responsible for sourcing nearly every grape supplier as well as negotiating every contract for the 2009,2010 and 2011 vintages." (Manlin Decl., ¶ 13.) With respect to a review of the Red Wine Program wines written by Lettie Teague, Manlin claims: "I was the one responsible for sending Lettie the wines, getting her to taste them, providing her photos and tasting notes and indicating that we do not reveal our vineyard sources." (Id.) He further states: "I continued to promote and market the Cold Heaven wines, including the viognier up through October 2012. This includes securing restaurant placements in Chicago, sending direct buyers to the winery and pouring the wines at promotional events…" (Id., ¶ 14) and that "[a]fter the 2010 harvest, the RWP (Red Wine Program of Cold Heaven Cellars) participated in a Pinot Noir festival held in Chicago (Pinot Days) and Ms. Clendenen accompanied me on this trip." (Id., ¶ 15.) Manlin and/or his Bonvivino claim to have expended tens of thousands of dollars in "travel and entertainment" expenses purportedly incurred in Manlin's efforts to market the Red Wine Program wines. (Clendenen Decl., ¶ 24; Ex. G.) Additionally, Bonvivino's own documents detail Manlin's direct involvement in Red Wine Program wine production and sales efforts. (Id., ¶¶ 20(a), 21(a)-(c), 22(a)-(b), (c)-(e), 23, 25(b)-(g).) They also highlight the level of supervision he demanded. (Id., ¶¶ 20(b); 25(a).)

Manlin intercepted at least one payment sent to Cold Heaven in payment for Red Wine Program wines and caused it to be deposited into a Bonvivino account at First Bank, to which only he had access. (Id., ¶ 26; Ex. I.) He additionally obtained payment,

1  made payable to his Bonvivino, directly from a wine distributor for Red Wine Program
2  wines invoiced by Cold Heaven. (Id., ¶ 27; Ex. J.)
3      Neither Manlin nor Bonvivino has, or has ever had, a federal permit or state
4  license to sell alcohol, nor did Manlin or Bonvivino ever formalize the Red Wine
5  Program, an alleged joint venture, as a separate legal entity with its own permit(s) or
6  license(s). (Id., ¶ 28; Ex. J.)

7      **C.   Cold Heaven**
8      Cold Heaven holds, and since well before the time period relevant to this lawsuit
9  has continuously held, California Department of Alcoholic Beverage Control ("ABC")
10 license of type 2 (winegrower) and type 9 (beer and wine importer). Cold Heaven
11 likewise holds, and at all times relevant hereto has continuously held, a wine producers
12 and blenders permit issued by the federal Alcohol and Tobacco Tax and Trade Bureau
13 ("TTB"). (Id., ¶ 18.)
14     Neither Bonvivino nor Manlin are, nor has either ever been, a member of Cold
15 Heaven Cellars, LLC. (Id., ¶ 13.)

16     **D.   Morgan Clendenen**
17     Morgan Clendenen does not have a college degree, or any training in legal or
18 regulatory formalities. (Id., ¶ 2.) In navigating the maze of government regulations, she
19 reasonably relies, as the vast majority of small business owners must, on the expertise of
20 her trusted and experienced advisors. (Id.)

21     **E.   Manlin's Knowledge of Illegality**
22     Becky Barieau, CPA has long been Cold Heaven's accountant. Ms. Barieau is a
23 sole proprietor who has specialized in wineries for more than two decades; she is the tax
24 accountant for eight wineries (including Cold Heaven) and is also an owner of, and the
25 general manager for, the large and successful Foxen Winery. (Id., ¶ 17.) In an April
26 14, 2011 email exchange, Ms. Barieau advised Manlin: "If you form a California
27 partnership between Bonvivino Capital and Cold Heaven in which you are both financial
28 participants in the production & sale of wine, you will need an ABC license." (Id., ¶ 18;

Ex. B.) Manlin acknowledged this in his April 14, 2011 reply email: "We will definitely look into what needs to be done and we certainly need to comply with whatever laws are applicable." (Id.)

### F. Clendenen Could Not Have Added Manlin to the License or Permit

The application forms for the necessary permit and license required knowledge about Manlin and/or his Bonvivino that Clendenen, despite being in a personal relationship with Manlin, simply did not have. (Id., ¶ 16; Ex. A.)

### III. ARGUMENT

Manlin was more than a passive investor in the Red Wine Program; he admits his active role in the production and sales of these wines. As such, he or his Bonvivino needed to obtain (at least) a federal permit and a California state license to participate in profits from those sales, or to be part of a separately formed entity that held such permits and licenses. He knew this, and he did not do it. Without those permits and licenses, the contract alleged by Manlin's Bonvivino is illegal and unenforceable as plead.

### A. Manlin's Involvement was Not Passive

Manlin, who for all intents and purposes *is* Plaintiff Bonvivino, was – by his own allegations and admissions – actively involved in the production and sales of the Red Wine Program wines. He was no "passive investor," but rather had and demanded the ability to patrol and control the operations of the Red Wine Program and sales of its wine. The Plaintiff's own documents discuss: Manlin's contribution of "extensive personal effort and know-how, sales contacts and fieldwork"; how he "sold wines and continued to sell wines" and spent thousands of dollars on "sales calls"; how he styled himself Cold Heaven's chief financial officer, setup its financial spreadsheets, and was a signatory on Cold Heaven's bank accounts; demanded and expected extensive monitoring and supervision of the operation and sales of the Red Wine Program wines; etc. He exercised control over the winemaking process; he involved himself in the daily operations of the Red Wine Program – to the extent of demanding to set Cold Heaven's bookkeeper's priorities, and providing the spreadsheets she used; he personally sold

1  (placed) wines with hotels and restaurants; and he believed "wines I sell directly should
2  benefit me." In so contributing his own efforts, he cannot claim to have been a mere
3  passive investor.

4      **B.**    **Federal TTB Permit Required**

5      Under the Federal Alcohol Administration Act, 27 U.S.C. §§ 201-212 (1976),
6  ("the FAA Act") Cold Heaven, as a producer, blender, bottler, and wholesaler of wine,
7  was required to – and did – obtain a permit from the TTB. As such, Cold Heaven was
8  and is in compliance with certain substantive provisions of the FAA Act, with the
9  Twenty-First Amendment, and with other federal laws and regulations, including 27
10 C.F.R. § 24.101, which requires that a "person desiring to conduct operations involving
11 untaxpaid wine, including the use of spirits in wine production, shall file an application
12 and bond as provided in § 24.105." Under 27 C.F.R. §§ 24.105-106, anyone who wishes
13 to establish a winery or sell wine wholesale must file an application to Establish and
14 Operate Wine Premises. "Any person intending to engage in the business of producing or
15 blending wine or purchasing wine for resale at wholesale is required under the Federal
16 Alcohol Administration Act, as amended (49 Stat. 978; 27 U.S.C. § 203) to obtain a
17 basic permit." (27 C.F.R. § 24.106.)  Only when the TTB approves the Application is the
18 Applicant authorized to operate: "Operations requiring a basic permit may not be
19 conducted until the basic permit application is approved." (Id.)

20     Bonvivino or Manlin could have, together with Cold Heaven or Clendenen,
21 formed a limited liability company, a corporation, a limited partnership, etc., and that
22 resulting entity could have applied for this necessary federal permit. No law would have
23 prevented Cold Heaven from having an interest in two wine production basic permits.

24     Alternately, had the parties agreed on valuation for Cold Heaven, etc., Bonvivino
25 or Manlin may have obtained a membership interest in Cold Heaven and perhaps have
26 been added to Cold Heaven's permit via an amendment made pursuant to 27 C.F.R.
27
28

§ 24.120[2]. Finally, Manlin (who is not a party to this action) might[3] have become an actual officer of Cold Heaven – he self-styled himself its "chief financial officer" for a time. However, none of these happened, despite Manlin's actual knowledge that licensing formalities needed to be addressed.

As such, there is simply no way that Bonvivino could participate in profits made from the sale of alcohol, without having been pre-authorized by the TTB as a result of a filed and approved amended Application from Cold Heaven, under 27 C.F.R. §§ 24.109, 24.110, and 24.120 – which would have had to include disclosure of Bonvivino's "other interest" or an new Application from Bonvivino or Manlin, neither of which exist. That means that those entities *had no authority to operate in the liquor business*.[4]

Bonvivino *might* have sought to obtain an interest in Cold Heaven (and indeed, the parties discussed such an arrangement, though could not come to a mutually agreed upon value for the winery), but even that fails under federal law. Such an interest would have

---

[2] Alternately, 27 CFR § 24.123 permits for the filing of a new list of shareholders annually on May 1, "provided the sale or transfer of capital stock does not result in a change in the control or management of the business."

[3] The TTB forms require listing "LLC members/managers, *corporate* officers and directors," etc.; Application for Basic Permit Under the Federal Alcohol Administration Act, Form TTB F 5100.24 *available at* http://www.ttb.gov/forms/f510024.pdf (emphasis added); as such, it's unclear as to whether Manlin could simply have been an 'officer' of the Cold Heaven limited liability company, or if he would have had to have been made a member thereof.

[4] The wine bond is another pre-requisite to a permit. This is essentially an insurance policy insuring that the winery will pay taxes that have become due.  Alcohol taxes become due when the grapes have turned to alcohol, but have not yet been paid. Hence even though the term Bonded Winery has become a term of art, no winery can exist without a bond in the United States. 27 C.F.R. § 24.146(a) Wine bond. "The proprietor shall give bond on TTB F 5120.36, Wine Bond, to cover the liability for excise taxes imposed by the Internal Revenue Code of 1986, on wines produced or received by the proprietor. The bond will apply to wine, spirits, and volatile fruit-flavor concentrate, or other commodities subject to tax under 26 U.S.C. chapter 51, in transit to or on bonded wine premises, and to the operations of the bonded wine premises, whether the transaction or operation on which the proprietor's liability is based occurred on or off the proprietor's premises. The bond will provide that the proprietor shall faithfully comply with all provisions of law and regulation relating to activities covered by the bond. This bond has a tax obligation limit of $500 for wine removed from bonded wine premises on which the tax has been determined, but not paid, unless the total penal sum of the operations bond is $2,000 or more and the proprietor and the surety designate $1,000 of this amount as the obligation limit for wine on which the tax has been determined, but not paid."

been *conditional upon approval by the TTB* of an application that included Bonvivino, seeking an authorization for Cold Heaven to operate with Bonvivino as an interest holder in Cold Heaven under 27 C.F.R. § 24.106. Because such an interest would have arisen after Cold Heaven's initial application, such an interest would have required an amended application to the TTB pursuant to 276 C.F.R. §§ 24.120, 24.125. Until and unless the TTB provided that authorization, Bonvivino *could not have had an interest* in Cold Heaven, per 27 C.F.R. 24.101 *et seq*.

Likewise, federal law makes it unlawful to engage in the business of producing and selling wine without a basic permit; 27 U.S.C. § 203. However, as has been demonstrated, Bonvivino (through its managing member, Manlin) actively participated in the production of the Red Wine Program wines and the financial, sales, and marketing of those wines, styling this arrangement as a "joint venture" or "partnership," with the alleged attendant community of interest, sharing of profits, and joint right of control. Without prior authorization, that simply cannot be.

### C. California ABC License Required

The necessity of a license to deal in alcoholic beverages is found in the California State Constitutional provision that declares it unlawful for any person other than a licensee of the Department of Alcoholic Beverage Control to manufacture, import, or sell alcoholic beverages in the state; Article XX, section 22 of the California Constitution grants the California Department of Alcoholic Beverage Control the authority to regulate the manufacture and sale of alcoholic beverages, in accordance with laws enacted by the Legislature for the protection of the public health, safety, and welfare. Cal. Bus. & Prof. §§ 23001 *et seq*. The public policy concerns underlying these laws are of the "highest degree" of importance:

> "This division is an exercise of the police powers of the State for the protection of the safety, welfare, health, peace, and morals of the people of the State, to eliminate the evils of unlicensed and unlawful manufacture, selling, and disposing of alcoholic beverages, and to promote temperance in the use and consumption of alcoholic

beverages. It is hereby declared that the subject matter of this division involves in the highest degree the economic, social, and moral well-being and the safety of the State and of all its people. All provisions of this division shall be liberally construed for the accomplishment of these purposes." Cal. Bus. & Prof. Code § 23001.

While it is true that the California statutes do not explicitly state that a license is required to share in the profits of wine sales, the State Attorney General's Office has offered clarification. In an opinion addressing the question of whether an on-sale public premises licensee may enter into either "a sublease or concession agreement for the operation of a card-room on the licensed premises" or "a sublease agreement with an operator of machines for the vending of cigarettes, candy, games of skill and music upon the premises, which agreement requires payment to the licensee of a fixed monthly sum," the Attorney General concluded that there is no specific legal prohibition on such a business arrangement between a licensee and an unlicensed participant, "so long as the licensee of the Department retains full authority over the sale of alcoholic beverages," and "so long as [the unlicensed party or entity] *receives no percentage or portion of the revenues derived from the sale of alcoholic beverages*." 47 Ops. Cal. Att'y. Gen 182 (1966); 1966 Cal. AG LEXIS 86, 2-3 (emphasis added). The purpose of this limitation is to ensure that the licensee retains "full and complete authority to enforce all laws and Department rules relating to the sale and consumption of alcoholic beverages." Id. at 6.

Likewise, the California ABC recently noted the general rule: "[P]rofiting from the sale of alcoholic beverages [is a] fundamental privilege[] of a licensee … if non-licensees share in the profits from the sale of alcoholic beverages, violations of Business and Professions Code sections 23300 and 23355 may occur." (California Department of Alcoholic Beverage Control June 2009 Industry Advisory, *available at* http://www.abc.ca.gov/trade/Advisory-Third%20Party.pdf )

As has been demonstrated, neither Manlin nor Bonvivino is licensed by the ABC, nor did either acquire a membership interest in the licensed Cold Heaven (and even if he had, such an interest would have been subject to ABC investigation and approval,

pursuant to, e.g., Cal. Bus. & Prof. Code § 24071.1), nor did either take the steps necessary to establish the Red Wine Program as a distinct entity separately licensed by the California ABC. Cold Heaven's license permits Cold Heaven alone to produce and sell wine, per Cal. Bus. & Prof. § 24040 ("[e]ach license shall be issued to a specific person[5]").

Likewise, Manlin – not a party to this litigation – perhaps could have been an employee of Cold Heaven (despite giving himself the "CFO" title, he never was employed by Cold Heaven), and, after filing the corporate and personal questionnaires with the ABC (see, e.g., Clendenen Decl., ¶ 16) and otherwise complied with the "interest" requirement under 27 C.F. R. § 24.110. But he did not do that, either, choosing to run everthing through his Bonvivino LLC.

Either Bonvivino or a separate Red Wine Program entity involving Bonvivino needed to be licensed by the California ABC, and Manlin – despite having actual knowledge of this – did not obtain either license.

### D. The Alleged Contract is Illegal

As set forth above, the terms alleged for the Red Wine Program contract, specifically the alleged 50/50 profit split with unlicensed entity Bonvivino, is an illegal contract under California law, which is thus void and unenforceable.

California's Civil Code, section 1667(2)-(3), reads: "[t]hat is not lawful which is [c]ontrary to the policy of express law, though not expressly prohibited; or, [o]therwise contrary to good morals". Here, the statutes do not expressly forbid Bonvivino's profit participation, but such participation is clearly contrary to the policy of the express statutes, and contrary to the good morals the legislature seeks to enforce through the express laws: "The State of California … shall have the exclusive right and power to license and regulate the manufacture, sale, purchase, possession and transportation of alcoholic beverages within the State" (Cal. Const., Art. XX, Sect. 22) and thus exercises

---

[5] Business and Professions Code § 23008 defines "person" as including limited liability companies, and, joint ventures.

its "police powers … for the protection of the safety, welfare, health, peace, and morals of the people," treating the regulation of the sale of alcohol as involving "in the highest degree the economic, social, and moral well-being and the safety of the State and of all its people" (Cal. Bus. & Prof. Code § 23001.)

This contract then cannot be enforced by the Court: "No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out." *Yoo v. Jho*, 147 Cal. App. 4th 1249, 1251 (Cal. Ct. App. 2007) (quoting *Wong v. Tenneco, Inc.*, 39 Cal. 3d 126, 135 (1985)), and *see, e.g., Brenner v. Haley,* 185 Cal. App. 2d 183, 187 (Cal. Ct. App. 1960) ("a party to an illegal contract cannot set up a claim with an illegal contract as its basis"). While the specific issue of joint ventures between licensees and non-licensees in an alcohol context is evidently a matter of first impression, in an analogous situation, the California Appellate Court in *McIntosh v. Mills*, 121 Cal.App.4th 333 (2004) upheld the illegality of a contract for fee sharing between a lawyer and non lawyer:

> "The illegality of contracts constitutes a vast, confusing and rather mysterious area of the law." (Strong, The Enforceability of Illegal Contracts (1961) 12 Hastings L.J. 347 (Strong).) Nevertheless, enacted as part of the original Field Codes, the contractual doctrine of illegality has been codified in this state since 1872, and appears as Civil Code section 1608: "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Thus, where the illegal consideration goes to the whole of the promise, the entire contract is illegal. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 429, p. 386.) …
>
> "The doctrine of illegality focuses on the object of the contract because it is grounded on considerations of public policy: "The effect to be given to an illegal element of a contract should not depend upon who alleges and proves it nor upon the manner in which it comes to the attention of the court. Rather, it should depend upon how the court can best serve the interest of the public and, when not inimical to the public interest, do justice to the parties." (Strong, supra, 12 Hastings L.J. at p. 350, fn. omitted.)" Id., at 346.

The Court should adopt similar reasoning here.

### E. Clendenen's Acts Do Not Fall Within the *in pari delicto* Exception

The exception of *in pari delicto* exists to the general unenforceability of an illegal contract, and "allows an illegal contract to be enforced so long as the party seeking its enforcement is less morally blameworthy than the party against whom the contract is being asserted, and there is no overriding public interest to be served by voiding the agreement." *McIntosh, supra*, 121 Cal. App. 4th at 347. However, no such exception applies here.

As an initial matter, Clendenen is relatively unsophisticated, lacking a college degree. She had, prior to the initiation of the Red Wine Program, participated in forming a single winery, her Cold Heaven Cellars, more than a decade earlier. She reasonably relied on the expertise of others to advise her as to regulatory and other requirements ancillary to the actual craft of wine production. Manlin, by comparison, is a self-described finance executive with a graduate degree, a masters in business administration. Too, Cold Heaven did not have the funds to obtain an expert legal opinion on the question of Bonvivino's need for a license – indeed, the Red Wine Program arose because Cold Heaven would not otherwise have had the resources necessary to make red wines in 2009. A sophisticated, masters degree holding executive, should reasonably have been expected to investigate the legality of his six-figure investment.

Even if Bonvivino had no duty to perform such due diligence, however, it is incontrovertible that Ms. Barieau, acting on behalf of Cold Heaven, *affirmatively told Manlin* that the Red Wine Program needed an ABC license! That notice was provided, as Manlin acknowledged, in April of 2011, more than a year before this suit was filed – yet Manlin did nothing towards getting Bonvivino licensed or creating a new licensed entity in which Bonvivino would be a participant. Cold Heaven did what it was supposed to do, in alerting Manlin to the licensing requirements; it was the Plaintiff who abdicated its responsibilities.

Finally, the doctrine of "*in pari delicto* has traditionally been applied in the interest of society, rather than that of individual litigants." *Berner v. Lazzaro*, 730 F.2d

1319, 1321 (9th Cir. 1984) *aff'd sub nom. Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 105 S. Ct. 2622, 86 L. Ed. 2d 215 (1985). Here, as set forth above, public policy is strongly against Bonvivino in this matter; even if Cold Heaven or Clendenen came in any way into this transaction with some fault (that was not cured by their disclosure to Manlin, years before "profits" were even an issue, of the license requirement), the policies behind the California and federal alcoholic beverage regulatory schemes dictate the Court not ignore the illegality of Bonvivino's conduct, which is diametrically opposed to those public policies.

Without question, the interest of the public, as set forth exhaustively above, is served by ensuring the state and federal regulatory departments maintain their supervision of those having an interest in and generating profits from alcohol. Any other result would be, to quote Strong, as quoted in McIntosh, "inimical to the public interest." It is not unreasonable to anticipate that, were an unlicensed Bonvivino permitted to participate in the profits of alcohol sales, such precedent would embolden others – those who must skirt these laws, because of their criminal activity or their involvement in other tiers of the Alcohol System – to similarly and substantially flaunt the U.S. Consitition, the Constituion of the State of California, the Alcohol Regulatory Requirements of the FAA and 27 CFR 24 *et seq*., and the California ABC Act at Business and Professions Code §§ 23000 *et seq.*

### F.  Cal. Bus. & Prof. Code § 23101 Does Not Apply

California's Business & Professions Code § 23101, which the Plaintiff has suggested somehow authorized the Red Wine Program's profit, is not only inapplicable, it actually *strengthens* the Defendants' argument that Manlin or Bonvivino was required to be licensed by the ABC. The statute reads, in relevant part: "Any … financial institution owning or possessing alcoholic beverages or warehouse receipts therefor as security for an obligation or as a result of enforcement of a security interest may, *after permission has been given by the department*, sell the alcoholic beverages or warehouse

receipts to a *licensee authorized* to sell for resale such alcoholic beverages or such warehouse receipts." (Id., emphasis added.)

Here, even assuming *arguendo* that Bonvivino qualifies[6] as a financial institution, there was no security interest[7] alleged by the Plaintiff, nor was a security interest ever conveyed to Manlin or his Bonvivino. As such, Section 23101 is wholly inapplicable.

The Plaintiff's purported construction of a profit participation as a form of interest also fails. Lending arrangements involve pre-designated interest rates, not post-determined interest rates depending upon profit.[8] Thus Bonvivino's contention that its alleged profit split was in fact a *post facto* method of calculating the interest rate for the financing is farfetched at best (especially as "profit" is undefined in this alleged oral agreement, and profits are highly speculative and uncertain here).[9]

Further, Section 23101 would have permitted, *if* such a security interest existed, a *single* sale of the Red Wine Program wine by Bonvivino, an unlicensed person, *to a licensed person* who could then sell the wine – and even that solitary transaction requires the *permission* of the ABC. Section 23101 cannot be read to permit what Bonvivino alleges – the continued participation in profits, and the involvement in the specific operations of wine production, sales, etc., that Bonvivino and Manlin have claimed here.

---

[6] Which it likely does not; e.g., Cal. C.C.P. § 680.200 defines a "financial institution [as] a state or national bank, state or federal savings and loan association or credit union, or like organization, and includes a corporation engaged in a safe deposit business" (though various definitions occur elsewhere in the California Code).

[7] Such security interest would have had to have been documented in writing; an oral agreement, as alleged here, is simply insufficient: "The intent to create a security interest must appear on the face of a written document." *In re CFLC, Inc.,* 166 F.3d 1012, 1016 (9th Cir. 1999).

[8] Black's Law Dictionary (9th ed. 2009), defines a loan as a "thing lent for the borrower's temporary use; esp., a sum of money lent at interest," while interest rate is defined as the "percentage that a borrower of money must pay to the lender in return for the use of the money, usu. expressed as a percentage of the principal payable for a one-year period." Courts utilize general dictionaries when they seek to ascertain the "ordinary" meaning of words, *River Lines, Inc. v. Public Util. Com.* 62 Cal.2d 244, 247 (1965).

[9] There also could have been an assignment of profits, but assent by Cold Heaven would have to have be alleged and proven by Bonvivino under *Cockerell v. Title Insurance & Trust*, 2 Cal.2d 284 (1954) and would have had to have been reported to the TTB under 27 C.F.R. § 24.110.

IV. **REFORMATION OF THE CONTRACT**

Although the Defendants believe the alleged contract is illegal, void, and unenforceable as described, they recognize the injustice that would result if Bonvivino is not able to at the very least recoup its investment. The Court has already ordered an accounting, and has agreed that it shall determine which expenses and contributions contributed by Bonvivino were legitimate and mutually agreed upon. Accordingly, the Defendants suggest that an equitable resolution of this matter would be an award to Bonvivino of those legitimate and agreed upon contributions, less the amount already repaid by Cold Heaven, with a reasonable interest rate accruing on the unrepaid amount.

Additionally, so that Bonvivino can, legally and legitimately, realize some of the profit it allegedly bargained for, the Defendants propose granting a security interest in one half of the remaining Red Wine Program wines to Bonvivino, so that that the Plaintiff can then (assuming ABC permission) sell those wines to a licensed person.

V. **CONCLUSION**

Cold Heaven told Manlin that his Bonvivino, or the Red Wine Program as a discrete entity with Bonvivino identified as a partner, member, etc., needed to be licensed to participate in the Red Wine Program's profits. That notice was provided well before profit participation was remotely feasible, and more than a year before Bonvivino filed this lawsuit. The Court must not, due to the overriding public policies advanced by the state and federal regulation of wine production and sales, countenance Bonvivino's shirking of this known duty. Instead, the Court should ensure justice is served by not requiring Cold Heaven to engage in an illegal act, by rescinding the contract, and by awarding Bonvivino only those contributions that were both legitimate and mutually agreed upon, together with a reasonable interest rate and, optionally, a security interest in one half of the remaining Red Wine Program Wines. Anything else rewards Bonvivino's failure to take the steps required to legally participate in the Red Wine Program's profits.

|   |   |
|---|---|
| | Respectfully submitted, |
| | LOVITZ IP LAW, P.C. |
| Date: October 23, 2013 | By: /s/ R. Christopher Harshman |
| | R. Christopher Harshman, Esq. |
| | Attorneys for Defendants Cold Heaven Cellars, LLC and Morgan Clendenen |